**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                             Case No. 17-CR-02008-MV

DARIUS MUSE,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Darius Muse's Opposed Motion to Suppress Evidence. Doc. 43. The government filed a Response [Doc. 63] and Mr. Muse filed a Reply [Doc. 68]. The Court then held an evidentiary hearing on the motion on November 22, 2019. Doc. 62. Having considered the briefs, exhibits, witness testimony, relevant law, and being otherwise fully informed, the Court finds that the motion is well-taken and will be **GRANTED**.

## BACKGROUND

This motion centers on an encounter between Mr. Muse and Drug Enforcement Agency (DEA) Special Agent (SA) Jarrell Perry on a Greyhound bus in Albuquerque, New Mexico in July 2017. At issue is whether SA Perry violated the Fourth Amendment when he subjected Mr. Muse to a full body pat-down search on the bus and then arrested him. The following represents the Court's findings of fact, based on the evidence submitted as well as SA Perry's testimony at the November 22, 2019 hearing.[1] In the interest of brevity and clarity, the Court will cabin its discussion of the facts to those that bear on the issues it finds dispositive.

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including

## I.       Facts

In the early morning of July 1, 2017, SA Perry was patrolling the Greyhound bus station in Albuquerque, New Mexico.  Transcript of November 22, 2019 Hearing at 5:25–6:3 ("Tr."). [2] Sometime after 3:00 a.m., Perry boarded an eastbound bus and began to speak to passengers when they re-boarded.  *Id*. at 6:6–7.  He was in plainclothes with his firearm concealed.  *Id*. at 6:12–20. The government submitted the audio recording of SA Perry's encounters on the bus, as well as a transcript of the recording, as Exhibits 1 and 1A to its response.  *See* Doc. 63 Ex. 1 and 1A.  These exhibits show that SA Perry spoke with approximately five other passengers before getting to Mr. Muse.  *See* Doc. 63 Ex. 1A at 2–6.  He introduced himself as a "police officer" there to "check the bus… for security."  *See, e.g., id*. at 3:10.  He then asked the passengers where they were traveling to.  *See id*. at 2–6.  Responses varied from Fairbault, Minnesota; to Chicago, Illinois; to Austin, Texas.  *See id*.  SA Perry also asked three of the passengers about their luggage but did not ask to search it.  *See id*.  One of them nevertheless offered to let Perry look at her backpack, but he declined to do so.  *See id*. at 6:12–7:2.  When asked about his interaction with this passenger at the evidentiary hearing, SA Perry responded that he didn't "remember her specifically" and could not "recall the circumstances around her" because the interaction occurred approximately two and a half years ago.  Tr. 22:20, 24:19–23.

SA Perry then moved on to Mr. Muse, who was sitting in a window seat towards the rear of the bus.  Tr. 8:1–7.  As with the other passengers, Perry introduced himself as a "police officer"

---

the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").

[2] References to the transcript are to the draft copy.

there to check the bus "for security."  Doc. 63 Ex. 1A at 7:9.  Mr. Muse explained that he was headed to Akron, Ohio and was coming from California.  *Id.* at 7:14–19.  SA Perry asked if Mr. Muse was coming back on the bus, to which he replied that he was not sure.  *Id.* at 8:11–12.  Perry then requested consent to search Mr. Muse's bag for contraband [*Id.* at 8:17–19] which he gave by saying "yeah," offering to open the bag, and then telling Perry to "go ahead."  *Id.* at 8:18, 9:1, 9:5.  The search revealed nothing of interest.  Tr. 9 at 1–2.  When asked during the hearing why he requested to search Mr. Muse's bag but not the other passengers', SA Perry responded that he had made "numerous seizures" from passengers traveling to Akron.  *Id.* at 24:6–12.  He later testified that prior to hearing about Akron, there was "nothing at all" that made him suspicious of Mr. Muse.  *Id.* at 54:18–55:5.

After finding nothing in the bag, SA Perry thanked Mr. Muse and stated, "'Preciate, you have a good trip, okay?"  Doc. 63 Ex. 1A at 9:12.  Instead of moving on to another passenger, however, he then re-initiated the encounter by asking, "Sir, would you give me permission just to pat you down for contraband?"  *Id.* at 9:14–15.  What did or did not happen next is of central importance to the instant motion.  Perry testified that in response to his request, Mr. Muse said "yeah."  Tr. 9:2–3.  He further testified that he could make out that response when he later listened to the audio recording of the encounter, and that he would not have conducted the pat-down had he not received consent because he would not have had "any type [of] reasonable suspicion or probable cause to do that."  *Id.* at 12:12–18; 13:5–6.

Contrary to SA Perry's testimony, however, the transcript submitted by the government does not show Mr. Muse responding with the word "yeah" to his request for the search; instead, it records Mr. Muse's response as "IA" or inaudible.  The relevant portion of the transcript reads as follows:

**Perry:** Good for you.  Thank you sir, that's fine.  'Preciate, you have a good trip, okay?

**Muse:** You too.

**Perry:** Thank you.  Thank you very much, sir.  Sir, would you give me permission just to pat you down for contraband?

**Muse:** (IA)

*See* Doc. 63 Ex. 1A at 9:12–16.  The Court has also listened carefully to the audio of the encounter, and like the government's transcriptionist, it does not hear Mr. Muse responding to SA Perry with the word "yeah."  From the audio, the Court cannot make out a response at all.

What is not contested is that following the pat-down request, Mr. Muse stood up from his seat and raised his hands above his head while facing the front of the bus.  Tr. 9:3–7, 58:6–7.  He was sitting alone but there were other passengers in the vicinity.  *Id*. at 45:14–15.  Perry then began his search.  Using his palms and fingers, Perry patted down Mr. Muse's "waist up to his torso, up to his chest, around his back and up his back, and then [] down around his ankles on each leg, and [then] up… to his crotch or groin area."  Tr. 59 at 2–5.  Upon searching Mr. Muse's crotch, SA Perry felt a round, hard "bundle" between his legs which he believed to be drugs.  *Id*. at 10:3–11.  Based on the audio recording, the entire search took no longer than 15 seconds, and almost certainly less because that amount of time includes Perry's request.  *See id*. at 44:6–16.  SA Perry also provided a physical demonstration of the pat-down during the evidentiary hearing and it appeared to take no more than five to ten seconds to complete.  Mr. Muse did not object to the search while it was occurring.  *Id*. at 50:5–11.

SA Perry also made several other relevant statements at the evidentiary hearing on the topic of pat-down searches.  First, when asked how he feels about conducting a pat-down search of a male's private areas, Perry responded:

4

> Well, it's not something that I enjoy doing or like doing, but I know that that's where drugs are concealed, because they don't think – *passengers that are doing that don't think you're going to search there*.

Tr. 16:13–16 (emphasis added). Later, Perry also testified that pat-down searches of female passengers are "totally different" because with female passengers he avoids searching their breast, crotch, and buttocks areas, and accordingly only pats down "their waist area and their back." *Id*. at 53:17–54:4. Finally, SA Perry was asked on direct examination why in his sworn complaint he described his pat-down search as covering Mr. Muse's "lower abdomen" rather than his "crotch" or "groin." *Id*. at 14:1–5. In response, he testified:

> From my past experience of locating bundles in people's genital area or crotch or–and I referred to that in my complaints and reports in the past, and I had a couple different U.S. Attorneys advise me that maybe to word it differently because when we go to court, such as a preliminary hearing or suppression hearing or a trial, to basically–they didn't like the wording of, like, "in the genital area" or the "crotch." So that's basically why I–when I reference searching someone's person, either "lower abdomen area," or if it's a female, it's close up to their breast area, I'll say "in the upper abdomen area." So that's how I reference it in my complaints and reports.

*Id*. at 14:6–16. Perry then stated that he believed the rationale for the rewording was to protect defendants' privacy in open court and to "not make it uncomfortable" for them. *Id*. at 14:17–24.

Following the pat-down, SA Perry asked Mr. Muse for identification and then placed him under arrest. *Id*. at 17:1–7. Mr. Muse appears to have been holding a phone, which Perry told him to put down before handcuffing him. Doc. 63 Ex. 1A at 10:13–18. SA Perry then led Mr. Muse off the bus and transported him to the DEA's Albuquerque district office. Tr. 17:13–14. The arrest occurred at approximately 4:00 a.m., and the two arrived at the DEA office around 30 minutes later. *Id*. at 10:18–21. Sometime thereafter, SA Perry strip-searched Mr. Muse and discovered that he was in fact carrying a softball-shaped bundle in a pair of underwear he was wearing. *Id*. at 18:1–6; Doc. 63 Exs. 3–8. The bundle weighed 850 grams and field-tested positive

for the presence of methamphetamine, a result later confirmed by laboratory testing.  Tr. 29:13–23.

Around three hours later, at 7:19 a.m., SA Perry conducted a post-arrest interview of Mr. Muse.  Doc. 63 Ex. 2A at 2:1.  The government submitted a video-recording and transcript of the interview, both of which the Court has reviewed.  *See* Doc. 63 Exs. 2 and 2A.  Perry began by reading Mr. Muse his *Miranda* rights, which he waived.  *Id.* Ex. 2A at 2.  Mr. Muse then admitted that he was approached by an individual in California who asked him to transport drugs to Amarillo, Texas for $1,000.  *Id.* at 4.  He agreed and was instructed to wear a pair of underwear with a large ball of drugs taped to the crotch area.  *Id.*  Upon arrival in Texas, Mr. Muse was going to transfer the drugs to an awaiting individual in exchange for the $1,000.  *Id.* at 4–5.

Towards the end of the interview, the follow exchange occurred:

**Perry**:  Knowin' you had that on you, why did you give me permission to pat you down?

**Muse**:  I mean, cuz if I didn't, you still would…did anyways, right?

**Perry**:  No, I asked you for your permission.  I wouldn't've patted you down.

**Muse**:  Oh, I, I (UI) said, "I'm gonna pat you down."

**Perry**:  No.

**Muse**:  Cuz I didn't…

**Perry**:  Remember, I asked you permission.

**Muse**:  Oh.

**Perry**:  You don't remember that?

**Muse**:  I didn't really hear you cuz, you know, I had my headphones on so I didn't really hear you.

**Perry**:  So you're sayin' you don't remember me give, you givin' me permission?

**Muse**: No, I says, I heard you say, "Can I check the bag," and then I thought you said, "well, I'm gonna pat you down now." So…I was like…

**Perry**: No, no, I, just to let you know, I recorded the…our conversation and I asked you for permission…

**Muse**: Oh.

**Perry**: …to pat you down and you said yeah.

**Muse**: Oh, well, (UI) but I mean…

**Perry**: Was you so nervous, you probably don't remember?

**Muse**: Yeah.

Doc. 63 Ex. 2A at 15:11–16:12. From the video, Mr. Muse appears confused and genuinely surprised by SA Perry's assertion that he asked for consent for the pat-down search. *See* Doc. 63 Ex. 2. Perry could not recall at the evidentiary hearing whether or not Mr. Muse was wearing headphones during their encounter. Tr. 56:3–4.

Mr. Muse was subsequently charged with Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine. Doc. 12.

## II.    Procedural Background

On May 1, 2019, Mr. Muse filed his Opposed Motion to Suppress Evidence. Doc. 43. In it, he argues that his consent to the pat-down search was not voluntary [*Id*. at 13]; that SA Perry lacked probable cause when he arrested him on the sole basis of what he felt during the search [*Id*. at 11]; and that his post-arrest statements should be suppressed as the fruit of the poisonous tree [*Id*. at 15].

The government first responded by moving to strike Mr. Muse's motion as untimely. Doc. 46. Finding good cause for the delay, the Court denied that request. *See* Doc. 59 at 4–5. The government then responded to the merits on November 4, 2019. Doc. 63. On the issue of consent,

it argues that Mr. Muse gave "explicit consent" to the pat-down search and affirmed that consent by standing up and raising his arms. *Id*. at 13. The government further submits that Mr. Muse's consent was voluntary because SA Perry was in plain clothes, spoke in a polite tone, did not display his weapon, and did not block Mr. Muse's movements or physically restrain him. *Id*. at 15 (citing *United States v. Drayton*, 536 U.S. 194, 204 (2002)). The government additionally argues that the arrest was supported by probable cause because SA Perry determined that the hard bundle he felt was drugs based on its unnatural size, shape, and texture and based on his substantial narcotics experience. *Id*. at 17. The government has not directly responded to the defense's argument that Mr. Muse's post-arrest statements should be suppressed as the fruit of the poisonous tree if the Court were to find that a Fourth Amendment violation occurred.

Mr. Muse then filed a reply to the government's response on November 18, 2019. Doc. 68. In it, he raises the additional argument that even if he provided SA Perry consent to perform the pat-down search, the search exceeded the scope of his consent when it proceeded to his groin area. *Id*. at 3–4. He submits that the scope of the requested search was unclear because Perry asked to pat him down for "contraband," not drugs, and that he did not have time to object to the search's expanding scope because it was over in a matter of seconds. *Id*. On this issue, the government argues that SA Perry's search did not exceed the scope of consent because Mr. Muse "did not give any limiting conditions to the pat-down search of his person, and he exhibited his consent… both verbally and demonstratively, by first offering to open and then opening his duffle bag for the search of his luggage, and then by standing up from his seat and raising his arms, thus intentionally associating himself with the search of his person." Doc. 63 at 16.

**STANDARD**

**I.     Searches Based on Consent**

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable… subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations and internal quotations omitted). "It is equally well settled that one of the specifically established exceptions to [those] requirements… is a search that is conducted pursuant to consent." *Id.* (citing cases).

If the government seeks to validate a search based on consent, "[it] bears the burden of proving that the consent was freely and voluntarily given." *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (citations omitted). To carry this burden, the government must make two showings. First, it must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." *Id.* at 1537 (citations omitted). Next, it must prove that the consent was given "without implied or express duress or coercion." *Id.* The existence of consent is judged by an objective reasonableness standard. *United States v. Flores*, 48 F.3d 467, 468 (10th Cir. 1995). In other words, "the question is whether a reasonable law enforcement officer would have understood from the exchange… that the defendant [] consented to the search." *Id.* at 468–69.

Courts in the Tenth Circuit applying the objective reasonableness standard have held that consent to a search need not be verbal to be sufficiently clear and unequivocal; actions that clearly express it will suffice. *See, e.g., Flores*, 48 F.3d at 469 (finding clear consent where the defendant reopened the trunk of her car in response to the officer's request to do so); *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (same where the defendant removed a key from his pocket and

9

handed it to the officer); *United States v. Patten*, 183 F.3d 1190, 1195 (10th Cir. 1999) (same where the defendant unzipped his suitcase); United *States v. Jones*, 701 F.3d 1300, 1321 (10th Cir. 2012) (same where in response to an officer's request to search his residence the defendant turned, walked to the back door, unlocked it, and walked into the house with officers following).

However, actions that can be interpreted as expressing acquiescence rather than consent are not sufficient because "[m]ere submission to lawful authority does not equate to consent." *United States v. Manuel*, 992 F.3d 272, 275 (10th Cir. 1993) (citing cases including *Florida v. Royer*, 460 U.S. 491, 497 (1983)). In *United States v. Amezcua-Aguirre*, No. 15-CR-627 JAP, 2015 WL 13651271, at *18 (D.N.M. Oct. 23, 2015) (unpublished), for example, another court in the District of New Mexico considered the government's argument that SA Perry reasonably believed he had unequivocal consent to conduct a pat-down search where the defendant complied with his request to turn around. Citing *Manuel*, the court held that the "[d]efendant's willingness to turn around cannot reasonably be construed as clear consent to be searched" because that action could have just as likely signaled that the defendant "did not mind Agent Perry looking at her back although she did not want him to touch her" or that "she thought Agent Perry wanted to handcuff or arrest her and thought it best to comply with his request rather than be forcibly turned around." *Id*. The court in that case also rejected Perry's testimony that the defendant said "okay" in response to his request for the search where the audio recording, which it referred to as "the more reliable evidence," did not contain such a response. *Id*. at *7.

Similarly, in *United States v. Vaughn*, No. 11-CR-01235-MCA-1, 2013 WL 12333588, at *9 (D.N.M. Jan. 7, 2013) (unpublished), the court found that the defendant's question "do you want me to get up?" followed by her action of rising to her feet did not indicate unequivocal consent to SA Perry's request for a pat-down search because the defendant's actions were "equally

indicative that she understood she had no choice but to get up." *Id.* (citing *United States v. Gregory*, 204 F. Supp. 884, 885 (S.D.N.Y. 1962) ("a mere submission in an orderly way to the actions of arresting agents… is not that consent which constitutes an unequivocal, free and intelligent waiver of a fundamental right.")).

Courts in this circuit have further held that an officer cannot reasonably believe that they have specific and unequivocal consent for a search where the facts indicate that the person whose consent they are seeking may not have heard or understood the request. In *United States v. Benitez-Arreguin*, 973 F.2d 823 (10th Cir. 1992), the defendant was stopped by two state-level narcotics agents in an Amtrak station in Salt Lake City. *Id.* at 824–25. Upon realizing that he did not speak English, one of the agents made "hand motions" towards the defendant's bags "to indicate that he wanted to look into [them]." *Id.* at 825. In response, the defendant reportedly opened one bag and then bent down and opened a second bag before handing it to the agent. *Id.* In the second bag, the agent found a tube-shaped object containing heroin. *Id.* The district court held that the search lacked consent despite the defendant's actions because he never gave "clear and unequivocal" permission for the search and because the agent's pantomime gestures were "not sufficient to produce a consent" given the language barrier. *Id.* at 826. On review, the Tenth Circuit agreed, stating "the record amply supports the finding that the… search of the defendant's bag containing the controlled substance was not consensual." *Id.* at 829.

And in *Vaughn*, the district court applied the holding of *Benitez-Arreguin* where the defendant "was distracted when [SA] Perry asked for her consent for the pat down search because there were multiple overlapping conversations occurring at once and Defendant was on her cell phone." 2013 WL 12333588 at *8. In light of the defendant's "obvious distraction," and because

she "did not fully hear or comprehend Perry's request," the court found that her consent was ineffective. *Id.*

## II.     Scope of Consent

To admit evidence obtained during a consent search, a court must also find that the search did not exceed the scope of consent. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991). The scope of consent "is defined by the search's express object and is limited by the breadth of the consent given." *United States v. Freeman*, No. 01-CR-496 JP, 2002 WL 35650115, at *4 (D.N.M. Feb. 13, 2002) (citing *United States v. Elliott*, 107 F.3d 810, 814–15 (10th Cir. 1997)). Courts apply an objective reasonableness test that asks what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect," *Elliott*, 107 F.3d at 815 (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)), and then make a factual determination about whether the search exceeded the scope of consent based on the totality of the circumstances. *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990). A person's failure to object during a search "may be considered an indication that [it] was within the scope of [their] consent." *McRae*, 81 F.3d at 1538.

Although the Tenth Circuit has never directly addressed this issue, several other circuits have considered whether a search exceeds the scope of a person's consent when it proceeds unannounced to their private areas. The mixed results of these cases demonstrate that the analysis is highly fact-specific and depends on the location of the search, the words used by the officer requesting it, and the nature and extent of the officer's contact with the person's body. In *United States v. Blake*, 888 F.2d 795, 797 (11th Cir. 1989), the defendants were walking in the Fort Lauderdale International Airport when they were approached by two sheriff's deputies. After inspecting the defendants' tickets and identification, one of the deputies requested permission to

search their luggage and "persons" for drugs. *Id*. One of the defendants consented, and within seconds the deputy "reached into [his] groin region where he did a frontal touching of the outside of [the defendant's] trousers in the area between the legs." *Id*. (internal quotations omitted). Upon reaching into the defendant's crotch, the deputy felt a hard object and heard a crinkling sound. *Id*. The deputy then repeated this procedure after receiving the other defendant's consent and again "felt a foreign object in [his] crotch." *Id*.

Referring to the deputy's searches as "outrageous and unreasonable," the district court held that they exceeded the scope of consent and accordingly must be suppressed. *Id*. at 797–98. The Eleventh Circuit affirmed. *Id.* at 800. It noted that the deputy's request to search the defendants' "persons," without more explanation, "need not have been reasonably construed as a request for permission to touch [their] genitals." *Id*. The Eleventh Circuit further stressed that the search "took place in a public airport terminal" and that "[g]iven this public location, it cannot be said that a reasonable individual would understand that a search of one's person would entail an officer touching his or her genitals." *Id*. at 800–01.

By contrast, the D.C. Circuit affirmed the search of a suspect's groin in *United States v. Ashley*, 37 F.3d 678 (D.C. Cir. 1994). There, the defendant was stopped by a police officer on the street outside a Greyhound bus station. *Id*. at 679. After asking the defendant if he was carrying drugs on his person, the officer obtained his verbal permission to conduct a search. *Id*. The officer then conducted a pat-down, during which he "pressed in" on both sides of the defendant's legs from the pant cuff to the crotch, before pressing with his fingers "on the upper part of [the defendant's] abdominal area" in between "his watch pocket[s], the belt and his genitals." *Id*. at 680. He ultimately felt a hard object that he believed to be drugs. *Id*. at 679. At the suppression hearing, the officer denied manipulating the object with his fingers underneath the defendant's

pants or grabbing the whole of it with his hands. *Id.* at 680. Given the "limited" nature of the search, the D.C. Circuit held that it did not exceed the scope of the defendant's consent. *Id.* It noted, however, that police do not have "free reign" when performing searches of suspect's private areas and that the "general manipulation of a suspect's private areas will not be tolerated as part of a consensual search." *Id.* (citations omitted).

And more recently, in *United States v. Russell*, 664 F.3d 1279 (9th Cir. 2012), the Ninth Circuit also analyzed this issue. There, the defendant was approached by a police officer at a departure gate at the Seattle-Tacoma International Airport after a ticket agent observed him acting suspiciously. *Id.* at 1280. In response to the officer's request to search his person, the defendant verbally consented and then spread his arms and legs. *Id.* at 1281. The officer then patted him down, beginning from his ankles and working his way up to the groin area, where "lifted up" and felt a hard and unnatural object which turned out to be 700 pills of Oxycodone. *Id.* at 1280–81. The district court denied the defendant's motion to suppress and the Ninth Circuit affirmed, holding that the search did not exceed the scope of consent. *Id.* In so doing, it distinguished *Blake* because here the defendant was stopped on "concrete information," not at random, and because the officer "methodically worked his way up [the defendant's] legs before searching the groin" which "gave [him] an opportunity to withdraw or limit his consent," which he did not do. *Id.* at 1283–84.

## DISCUSSION

### I.      Consent to the Pat-Down

Because the Court agrees with SA Perry that he "didn't have any type [of] reasonable suspicion or probable cause" to justify his pat-down search of Mr. Muse, the search was only lawful if it was consensual. Tr. 13:5–6. The Court finds that the government has not carried its

burden of proving that it was. *McRae*, 81 F.3d at 1536. Specifically, the government has failed to establish through "clear and positive testimony" that a reasonable officer in SA Perry's position would have believed that Mr. Muse provided "consent [that] was unequivocal and specific and freely and intelligently given." *Id.* at 1537.

First, the Court does not find credible SA Perry's testimony that Mr. Muse said "yeah" in response to his request for the search. Tr. 9:2–3. It comes to this judgment for several reasons. To begin with, that response does not appear in the government's official transcript of the encounter, which managed to capture all of Mr. Muse's other verbal responses to that point. Doc. 63 Ex. 1A at 9:16. As noted above, the Court also listened carefully to the audio recording, and like the government's transcriptionist, it did not hear Mr. Muse say "yeah" in response to SA Perry's request; it did not hear him make any response at all. Given the conflict between Perry's testimony and the audio of the encounter, the Court finds the audio to be "the more reliable evidence." *See Amezcua-Aguirre*, 2015 WL 13651271 at *7. Mr. Muse's lack of an affirmative response would also be consistent with his assertion in the post-arrest interview that he thought SA Perry was telling him that he was going to perform the pat-down rather than asking for consent. *See* Doc. 63 Ex. 2A at 15:14, 16:4–5. Finally, the Court finds that other portions of SA Perry's testimony in this case also call his accuracy and credibility into question, including the fact that he could not remember details about the other passenger who offered to let him search her bag, [Tr. 23:20, 24:19–23], and the fact that he wrote in his sworn complaint that he searched Mr. Muse's "lower abdomen" rather than his groin [*Id.* at 14:1–5].[3]

---

[3] The Court finds SA Perry's testimony on the "lower abdomen" language extremely troubling, especially his testimony that a "couple different U.S. Attorneys" told him to avoid using language like "crotch" or "genital area" in his reports and sworn complaints. *See* Tr. 14:6–16. Although Perry explained his belief that these instructions were meant to protect the privacy of defendants in open court, the Court cannot help but consider the possibility that the vaguer language he was apparently instructed to use was instead meant to obscure the true nature of his searches and insulate them from Fourth Amendment scrutiny. If established, that kind of deliberate obfuscation would raise serious questions about the government's constitutional duty to disclose information helpful to the defense under *Brady v.*

Without the verbal response, the only fact suggesting Mr. Muse's consent to pat-down was his action of standing up from his seat and putting his hands above his head. Tr. 9:3–7. For the reasons explained below, the Court finds that this act alone was not enough to give SA Perry a reasonable belief that Mr. Muse was freely and intelligently providing him with "unequivocal and specific" consent for the search. *McRae*, 81 F.3d at 1537.

First, as in *Vaughn*, there are several indications that Mr. Muse may have been distracted when SA Perry asked for his consent, a fact that Perry should have taken into account when determining whether he had received the specific authorization he needed to proceed with the search. 2013 WL 12333588 at *8. For one, Mr. Muse's statements in the post-arrest interview indicate that he was wearing headphones when SA Perry made his request [Doc. 63 Ex. 2A at 16:14], a fact that Perry could not recall at the evidentiary hearing but did not deny [Tr. 56:3–4]. The transcript of the encounter also shows that Mr. Muse had a phone in his hand when he was arrested. Doc. 63 Ex. 1A at 10:13–15. Finally, just prior to asking Mr. Muse for consent to the pat-down, Perry made a statement signaling that their encounter was over: "Thank you, sir, that's fine. 'Preciate, you have a good trip, okay?" Doc. 63 Ex. 1A at 9:12. In response, Mr. Muse said, "You too." *Id*. at 9:13. Given that exchange, a reasonable passenger in Mr. Muse's position would have likely shifted his attention away from SA Perry and onto something else, only to be caught off-guard when Perry then immediately re-initiated the encounter by asking for permission for a pat-down. *Id*. at 9:14–15.

Taken together, these facts show that it was unreasonable for SA Perry to assume that Mr. Muse had clearly heard and understood his request for consent, a conclusion supported by Mr. Muse's later statement that he in fact had not. Doc. 63 Ex. 2A at 15:11–16:12. And because it

---

*Maryland*, 373 U.S. 83 (1963), as well as its ethical duty of honesty to the tribunal.

was unreasonable for SA Perry to assume that Mr. Muse had clearly heard and understood his request, it was also unreasonable for him to assume that Mr. Muse's subsequent act of standing up and raising his arms above his head was meant to express unequivocal and specific consent in response. *See Benitez-Arreguin*, 973 F.2d at 826; *Vaughn*, 2013 WL 12333588 at *8.

The Court also finds that it was unreasonable for SA Perry to believe that Mr. Muse had provided specific and unequivocal consent to the pat-down where his act of standing up and raising his arms could have just as easily communicated "[m]ere submission to lawful authority" and in fact did. *Manuel*, 992 F.3d at 275. As in *Vaughn*, Mr. Muse's actions were "equally indicative that [he] understood [he] had no choice" but to comply with SA Perry's request, 2013 WL 12333588 at *9, and under well-established law, acquiesence is not the same thing as consent. *Royer*, 460 U.S. at 497.

The government has therefore failed to carry its burden of proving by clear and positive testimony that Mr. Muse provided SA Perry "consent [that] was unequivocal and specific and freely and intelligently given" to justify the warrantless pat-down search. *McRae*, 81 F.3d 1536–37. Moreover, because SA Perry admittedly lacked legal authorization for the search beyond the purported consent, [Tr. 13:5–6], the Court finds that it violated the Fourth Amendment.

## II. Scope of Consent

The Court additionally finds that even if Mr. Muse unequivocally consented to the pat-down, the search exceeded the scope of his consent when SA Perry proceeded to search his crotch in view of the other passengers on the bus without specific permission to do so and before Mr. Muse had a reasonable opportunity to object.

First, the Court finds that the search's "express object," as communicated by SA Perry, would not have led the "typical reasonable person" to understand that it would involve an

exploration of their private areas. *Elliott*, 107 F.3d at 815; *Freeman*, 2002 WL 35650115, at *4. Unlike in *Ashley*, 37 F.3d at 678, Perry did not ask for permission to search Mr. Muse's person for drugs; instead, he asked for permission "just to pat [Mr. Muse] down for contraband." Doc. 63 Ex. 1A at 9:14–15. The pat-down request must also be placed in the context of the broader encounter, which SA Perry framed at the outset by introducing himself as a police officer there to "check the bus here for security." *Id.* at 7:9. Given the "security" frame and the fact that Perry used the word "contraband" to describe what he was looking for, not "drugs" or "narcotics," a reasonable person would have likely understood him to be requesting a pat-down for weapons. That distinction matters to the scope of consent analysis, because while the average person might anticipate that a search for drugs would involve their private areas, where drugs can be easily hidden, the same cannot be said about a search for weapons.

The Court further finds that, as in *Blake*, the public setting of the request–a Greyhound bus occupied by other passengers–would have cut against a reasonable person's belief that the requested pat-down would include an intrusive and embarrassing search of their genital area. 888 F.2d at 800–01. This assessment is supported by the testimony of SA Perry himself, who stated, presumably from his extensive experience conducting pat-down searches on buses and trains, that passengers "don't think you're going to search there." Tr. 16:13–16. Perry's testimony on this point not only suggests that his search exceeded the scope of Mr. Muse's consent, but that he knew it was going to and proceeded anyways. The Court also believes that the facts of *Russell* are distinguishable insofar as the average traveler would likely expect be searched more intrusively at an airport, where the national security stakes are considerably higher and where reasonable expectations of privacy have been diminished by body scanners and other intrusive measures implemented following the attacks of September 11, 2001. 664 F.3d at 1280–81.

Finally, the Court rejects the argument that the search of Mr. Muse's crotch was within the scope of his consent because he did not object when it proceeded there. While a person's failure to object during a search "may be considered an indication that [it] was within the scope of [their] consent," *McRae*, 81 F.3d at 1538, the Court agrees with the defense that this principle loses its logical force where the person did not have a realistic opportunity to object to the search before it was over. Such was the case here: from the audio recording and the in-court demonstration, SA Perry's pat-down of Mr. Muse was over within a matter of seconds. *See supra* at 4. The Court declines to interpret Mr. Muse's failure to object as an affirmation of his consent where it could just as easily be an indication that the search was over before he knew what was happening. The Court also rejects the government's suggestion that Mr. Muse could have reasonably anticipated where on his body SA Perry's hands were going to go. Tr. 68:6–16. A reasonable person may well expect a pat-down to proceed to areas near their genitals–such as the inner thigh, where a weapon could conceivably be secured–without expecting the officer to then move their hands up into what most people would consider the most private part of their entire body.

The Court accordingly finds that even if SA Perry reasonably believed he had Mr. Muse's unequivocal and specific consent for the pat-down search, it was not reasonable for him to believe that consent included tacit permission to search Mr. Muse's crotch on the bus in view of other passengers. Perry's search therefore exceeded the scope of Mr. Muse's consent. *Elliott*, 107 F.3d at 815; *Pena*, 920 F.2d at 1514.

### III.    Suppression Remedy

Under the fruit of the poisonous tree doctrine, evidence discovered "as a result of a search in violation of the Fourth Amendment must be excluded." *Oregon v. Elstad*, 470 U.S. 298, 305–06 (1985) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). A defendant has the initial

burden of establishing the causal connection between an illegal search and the evidence he seeks to suppress. *See United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018) (citing *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006)). The burden then shifts to the government to establish that the incriminating evidence was discovered by means "sufficiently distinguishable from the initial illegality to be purged of the primary taint." *Shrum*, 908 F.3d at 1233 (citing *Wong Sun*, 371 U.S. at 488). If the government can demonstrate "inevitable discovery, discovery by independent means, or attenuation, the evidence is not fruit of the poisonous tree and need not be suppressed." *Torres-Castro*, 470 F.3d at 999.

The Supreme Court addressed the admissibility of statements made after a Fourth Amendment violation in *Brown v. Illinois*, 422 U.S. 590 (1975). There, the Court held that *Miranda* warnings do not by themselves render such statements admissible because "even if the statements… were to be found voluntary under the Fifth Amendment, the Fourth Amendment issue remains." *Id*. at 601–02. It then identified three factors to consider in determining whether the taint of the Fourth Amendment violation had been purged prior to the statements: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id*. at 603–04 (citations omitted). Intervening circumstances may include "carefully explaining a consent form and advising an individual of the right to withhold consent, release from custody, an appearance before a magistrate, or consultation with an attorney, to name a few." *United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010) (citations and internal quotations omitted). The Tenth Circuit has further clarified that "purposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but

20

engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in hope that something might turn up." *Id*. (citations and internal quotations omitted).

The Court finds that the evidence SA Perry recovered at the DEA district office–including the methamphetamine found in Mr. Muse's pants and the statements he made during the post-arrest interview–must be suppressed as evidence discovered "as a result of a search in violation of the Fourth Amendment." *Elstad*, 470 U.S. at 305–06. The discovery of the methamphetamine was a direct result of Mr. Muse's arrest, which occurred immediately after SA Perry felt the hard bundle in his crotch during the unlawful search. Tr. 17:1–7 Nor has the government provided any reason to believe that the drugs would have been discovered inevitably or through an independent source. *Torres-Castro*, 470 F.3d at 999. To the contrary, SA Perry testified that he was relying on Mr. Muse's consent to justify the search because he had no reasonable suspicion or probable cause to suspect him of wrongdoing. *Id*. at 13:5–6.

The factors set forth in *Brown* also require that Mr. Muse's post-arrest statements be suppressed. 422 U.S. at 603–04. As to temporal proximity, Mr. Muse made the statements approximately three to three and a half hours after the unlawful arrest, not enough time for the taint of the illegality to have been sufficiently attenuated. The government has additionally failed to identify any significant intervening circumstances that broke the causal chain between the Fourth Amendment violation and the statements, such as Mr. Muse's release from custody, appearance before a magistrate, or consultation with an attorney. *Fox*, 600 F.3d at 1261. Finally, as to the purpose and flagrancy of the official misconduct, the Court finds that while SA Perry's actions could have been more egregious, he should have been more careful in verifying Mr. Muse's unequivocal consent and was on notice of the potential unconstitutionality of his actions where several other courts in this district have found searches he conducted under similar circumstances

to be illegal.  *See Vaughn*, 2013 WL 12333588 at *8; *Amezcua-Aguirre*, 2015 WL 13651271 at *16.  The fruits of the illegal search, including the methamphetamine seized at the DEA office and Mr. Muse's post-arrest statements, will accordingly be suppressed.

## CONCLUSION

For the foregoing reasons, Defendant Darius Muse's Opposed Motion to Suppress Evidence, [Doc. 43], is hereby **GRANTED**.

Dated this 20th day of December, 2019.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


Mallory M. Gagan                              Paul H. Spiers
Assistant Federal Public Defender             Assistant United States Attorney
*Attorney for Mr. Muse*