IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                    No. 17-CR-2008 MV

DARIUS MUSE,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the government's Motion for Reconsideration. Doc. 74. Mr. Muse filed a Response [Doc. 78] and the government filed a Reply [Doc. 80]. Having considered the motion, exhibits, relevant law, and being otherwise fully informed, the Court finds that the motion is not well-taken and will be **DENIED.**

### BACKGROUND

**I.**    **Mr. Muse's Motion to Suppress Evidence**

On July 27, 2017, Mr. Muse was charged by indictment with Possession with the Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine. Doc. 12. The charge arose after Drug Enforcement Agency (DEA) Special Agent (SA) Jarrell Perry conducted a pat-down search of Mr. Muse on a Greyhound bus in Albuquerque, New Mexico, felt a suspicious bulge in his pants, arrested him, and discovered that he was carrying methamphetamine. Doc. 71 at 2–6.

On May 1, 2019, Mr. Muse filed a Motion to Suppress Evidence. Doc. 43. In it, he argued that the fruits of SA Perry's search should be suppressed because he did not voluntarily consent to the pat-down and because his arrest lacked probable cause. *Id.* at 11–13. In his Reply, Mr. Muse

also argued that even if he did provide valid consent to the pat-down search, the search exceeded the scope of his consent when it proceeded unannounced to his groin area. Doc. 68 at 3–4. The government opposed these arguments, and on November 22, 2019, the Court held an evidentiary hearing on the motion. Doc. 62. At the evidentiary hearing, the Court heard testimony from SA Perry for approximately two hours. *See* Doc. 69 at 1–2. The government also submitted an audio recording of SA Perry's interaction with Mr. Muse on the Greyhound bus, as well as a transcript of the recording prepared by a government transcriptionist. *See* Doc. 63 Ex. 1 and 1A.

In a 22-page Memorandum Opinion and Order filed on December 20, 2019, the Court granted Mr. Muse's motion, finding that suppression was required for two reasons. *See* Doc. 71. First, the Court found that the government had failed to establish through "clear and positive testimony" that a reasonable officer in SA Perry's position would have believed that Mr. Muse provided consent "[that] was unequivocal and specific and freely and intelligently given." *Id*. at 15 (citing *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)). Second, the Court found that even if Mr. Muse had provided unequivocal consent, SA Perry exceeded the scope of that consent when he searched Mr. Muse's crotch in view of the other passengers on the bus without his specific permission to do so and before he had a reasonable opportunity to object. *Id*. at 17.

In determining that it was unreasonable for SA Perry to believe he had Mr. Muse's consent for the pat-down search, the Court made a finding of fact about the credibility of Perry's testimony. Specifically, it found that SA Perry's testimony that Mr. Muse said "yeah" in response to his request for the search was not credible. Doc. 71 at 15. The Court explained that it came to this judgment for several reasons. *Id*. First, the Court noted that while it could clearly hear all of Mr. Muse's other responses to SA Perry on the audio recording provided by the government, it could not hear the word "yeah" in response to Perry's request for the pat-down search. *Id*. The Court

noted that government's transcriptionist also did not hear this response, as demonstrated by the fact the transcript submitted by the government recorded Mr. Muse's response as "IA" or inaudible. *Id*. In deciding to rely on the audio recording over SA Perry's testimony, the Court cited another case from the District of New Mexico, *United States v. Amezcua-Aguirre*, No. 15-CR-627 JAP, 2015 WL 13651271 (D.N.M. Oct. 23, 2015) (unpublished), that is closely on point. In that case, the District Court found that Perry's testimony that the defendant said "okay" in response to his request for a pat-down search was contradicted by the audio recording of the encounter, which it referred to as "the more reliable evidence." *Id*. at *7.

In finding SA Perry's testimony about Mr. Muse's response not credible, this Court also pointed to the fact that the lack of an audible response from Mr. Muse on the audio recording was consistent with his statements to SA Perry in his post-arrest interview. Doc. 71 at 15. Specifically, the Court found that Mr. Muse's failure to respond to the request would have made sense given that he believed Perry was *telling* him that he was going to conduct the pat-down, rather than *asking* for his consent. *Id*.

Finally, the Court noted that other portions of SA Perry's testimony also called the accuracy and credibility of his testimony into question. *Id*. Specifically, the Court pointed to the fact that SA Perry had been unable to remember details about another encounter on the bus just prior to his encounter with Mr. Muse, and the fact that he used the words "lower abdomen" in his sworn complaint to describe what he later admitted was a search of Mr. Muse's crotch. *Id*. When asked at the evidentiary hearing why he used this language in his complaint, SA Perry testified that he had been advised by a "couple different U.S. Attorneys" to avoid using language like "crotch" or "genital area" in his reports and complaints. *Id*. at n.3.

## II. The Government's Motion for Reconsideration

On January 21, 2020, the government filed the instant Motion for Reconsideration. Doc. 74. In it, the government asks the Court to reconsider its finding that SA Perry was not credible when he testified that Mr. Muse said "yeah" in response to his request for the pat-down search. *Id*. at 1. In support of its request, the government submitted "new evidence from an experienced audio forensics expert in the private sector that the government engaged shortly after the Court issued its ruling." *Id*. This new evidence includes four new audio exhibits: a clarified version of the entire audio recording of SA Perry's encounter with Mr. Muse on the Greyhound bus (Exhibit 12); a clip of the clarified audio containing only the relevant question and potential response (Exhibit 13); a clip of the same "with further enhancement" (Exhibit 14); and the clip slowed down by 25% (Exhibit 15). Doc. 74 at 2. The government also submitted an expert report by the audio forensics expert who prepared the enhanced audio clips. Gov't Ex. 16.

The government argues that while Mr. Muse's response of "yeah" is "very difficult to hear on any recording, including on the new recording excerpts," it can indeed be heard, as SA Perry testified. Doc. 74 at 2–3. It submits that the difficulty in hearing Mr. Muse's response is caused by several factors, including "the limitations of the body worn recording equipment that Agent Perry uses" as well as the fact that "Agent Perry and Mr. Muse are two relatively soft-spoken men who happened to speak over one another at that point of the recording." *Id*. at 3. More precisely, the government submits that "Mr. Muse answered 'Yeah' to Agent Perry at the same time as Agent Perry was saying the word 'contraband,' which is why it is so difficult to hear Mr. Muse's response." *Id*.

The government then suggests that the other facts the Court relied upon in making its credibility determination are open to alternative interpretations. For example, it argues that other

parts of Mr. Muse's post-arrest statements could be interpreted to suggest that he did in fact provide consent [*id*. at 5–9]; that SA Perry's failure to remember details about the other passengers he encountered on the bus can be explained by the large number of individuals he has interacted with on buses and trains over the years [*id*. at 10]; and that SA Perry's use of the words "lower abdomen" in his sworn complaint was a misplaced "precaution" aimed at the "laudable goal" of avoiding unnecessary embarrassment for defendants [*id*. at 13]. The government also points to the photographs SA Perry took of the methamphetamine in Mr. Muse's crotch to argue that Perry did not attempt to obscure the details about where the drugs were hidden. *Id*. at 14.

In response, Mr. Muse argues that the Court made the appropriate findings of fact and that the government's newly submitted evidence does not contradict the Court's initial findings. Doc. 78 at 5. As to the enhanced audio recordings, Mr. Muse submits that they are "inconclusive *at best*" and that "[d]efense counsel does not hear a 'yeah' answer following Agent Perry's question in any of the four clips provided." *Id*. at 4 (emphasis in original). Mr. Muse also argues that because the government submitted a version of the audio recording and transcript in its original response, the instant Motion for Reconsideration "presents no new evidence." *Id*. at 3. Rather, he argues, "[t]he government simply disagrees with how the Court weighed parts of the recorded statement and urges it to change its analysis." *Id*.

Mr. Muse also responds to the government's arguments about the Court's other justifications for its credibility finding. On the reliability of SA Perry's memory, he notes that Perry could not recall at the evidentiary hearing whether Mr. Muse was wearing headphones or had a phone in his hand at the time of his arrest, "further calling into question his memory of the encounter." *Id*. n.1. And on Perry's use of the "lower abdomen" language in the complaint, Mr. Muse argues that "[t]he government's return to this argument still fails to provide justification for

5

Agent Perry's inaccurate and highly misleading criminal complaint." *Id*. He submits that "[t]he undisputed fact is that Agent Perry prepared a sworn affidavit, presented it to a Magistrate Judge for approval, and then wrote in the official DEA documentation of the incident (his report) in a way that was inaccurate and concealed the true nature of his encounter with Mr. Muse." *Id*. at 4. The defense then adds "[t]hat Agent Perry acted in concert with prosecutors to write misleading affidavits and reports does nothing to remedy this troubling fact. It was unquestionably appropriate for the Court to weigh this significant issue in its credibility analysis and in making its findings of fact." *Id*.

In reply, the government maintains that "Mr. Muse's faint response to Agent Perry's clearly audible question… *can be heard* on every version of the audio recording." Doc. 80 at 2 (emphasis in original). It also argues that "no weight was given to the fact that Mr. Muse effectively admitted or acknowledged to Agent Perry in his post-arrest interview that he had given Agent Perry permission to pat him down." *Id*. at 3. In asserting that Mr. Muse effectively made this admission during the interview, the government points to the fact that he never denied giving consent. *Id*. Finally, the government argues again that while the Court was "right to have criticized" SA Perry's practice of using language like "lower abdomen" in his sworn complaints, if he had "something nefarious in mind" he would not have taken the photographs of the drugs in Mr. Muse's crotch and provided them to the defense. *Id*. at 5.

## STANDARD

It is well-established in this Circuit that, although the Federal Rules of Criminal Procedure do not expressly authorize a motion for reconsideration, such motions are proper in criminal cases. *See United States v. Christy*, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011) (Browning, J.) (stating that in the criminal context, "courts ordinarily apply the same standards as those used in civil

cases" for motions to reconsider), *aff'd*, 739 F.3d 534 (10th Cir. 2014). A district court may therefore amend its interlocutory orders prior to entry of final judgment. *See, e.g.*, *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991) ("The Federal Rules of Civil Procedure do not recognize a 'motion to reconsider.' Instead, the rules allow a litigant subject to an adverse judgment to file either a motion to alter or amend the judgment . . . or a motion seeking relief from the judgment."); *Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch.*, 212 F. App'x. 760, 765 (10th Cir. 2007) ("A district court has discretion to revise interlocutory orders prior to entry of final judgment."). Hence, "[w]hen a party seeks to obtain reconsideration of a non-final order, the motion is considered 'an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'" *Wagner Equip. Co. v. Wood*, 289 F.R.D. 347, 349 (D.N.M. 2013) (quoting *Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991)). The Court's authority is sustained by the pragmatic reality that a "district court should have the opportunity to correct alleged errors in its dispositions." *Christy*, 739 F.3d at 539. Consequently, the district court enjoys "considerable discretion in ruling on a motion to reconsider." *Federated Towing & Recovery, LLC v. Praetorian Ins. Co.*, 283 F.R.D. 644, 651 (D.N.M. 2012) (citing *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997)).

The scope of reconsideration, however, is narrowly cabined and far more limited than in an ordinary appeal. That is because a motion to reconsider is an "inappropriate vehicle [ ] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Rather, "[g]rounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.*

7

**DISCUSSION**

This Court is always willing to reexamine both its legal reasoning and its weighing of the factual evidence upon a motion for reconsideration. Where newly available evidence or law calls into question a ground upon which the Court relied, or if the Court simply came to an erroneous conclusion on the existing record, it will revise its findings as necessary to correct clear error or prevent manifest injustice. *Servants of Paraclete*, 204 F.3d at 1012.

However, after carefully reexamining the record in this case, carefully listening several times to the newly enhanced audio that the government has presented, considering the expert report it has submitted, and taking into account the arguments advanced by both sides, the Court finds no reason to disturb its earlier finding as to SA Perry's credibility. Despite the government's efforts, none of the evidence it has presented has corroborated Perry's claim that Mr. Muse said "yeah" in response to his request for the pat-down search. Like its transcript before, the government's new expert exhibits do not affirm SA Perry's account of what was said; to the contrary, the enhanced audio of the encounter remains unclear, and to the extent that it presents new evidence, that evidence does not align with Perry's testimony or the government's version of events. Nor does the Court find clear error in its other reasoning. Instead, the Court's review of the record reaffirms its concerns about SA Perry's credibility in this case.

First, having listened carefully to the newly enhanced audio recordings submitted by the government, the Court agrees with the defense that Mr. Muse's purported response of "yeah" is still not audible. Doc. 78 at 4. The report of the government's own expert, Bryan Neumeister, supports this finding. In his expert report, Mr. Neumeister transcribed the enhanced audio as follows:

**Officer:** "Sir would you give me permission just to pat you down for contraband?"

> **Suspect:** "I (*inaudible*) waist or waste………….OK"

Gov't Ex. 16 at 5. The word "yeah," which SA Perry testified that he heard at the time of the encounter and again when he listened to his audio recording at the DEA office [Doc. 72 at 12:4–19], does not appear in this new expert transcription, just as it did not appear in the initial transcript submitted by the government [Doc. 63 Ex. 1A at 9:12–16].

The expert report also appears to undermine the government's assertion that Mr. Muse's response is not easily audible because it was made at the same time SA Perry said the word "contraband." *See* Doc. 74 at 3. The first question Mr. Neumeister was asked to review was whether there was "additional dialogue from the person appearing to be interviewed masked by the officer's question?" Gov't Ex. 16 at 5. His response: "**Negative**." *Id.* (emphasis in original).

Further, while the word "OK" appears in the new transcript and is attributed to Mr. Muse, the Court finds that the audio evidence is still highly uncertain and does not clearly support Perry's claim that Mr. Muse provided an affirmative response. For one, as indicated by the ellipses in the new transcript, the word "OK" does not come right after SA Perry's question, as one would expect if it was said in response. Gov't Ex. 16 at 5. Instead, based on the Court's review of the enhanced audio, the "OK" can be heard at the 4:28 mark of the recording, approximately seven seconds after the end of Perry's question. *See* Gov't Ex. 12 at 4:21–28. This seven-second gap is inconsistent with the notion that the "OK" on the recording represents Mr. Muse's affirmative verbal consent to the pat-down. Second, it is far from clear that the word "OK" came from Mr. Muse. While the government's new expert makes this attribution, he does so with reservation, stating that "[w]ithout doing an extensive voice comparison… [t]he frequency response and vocal characteristics of the 'OK' seem to come from the suspect." Gov't Ex. 16 at 5. Even more tellingly, the government's

first transcript attributed this entire line *to SA Perry*. The initial transcript submitted by the government reads as follows:

> **Perry:** Thank you. Thank you very much, sir. Sir, would you give me permission just to pat you down for contraband?
>
> **Muse:** (IA)
>
> **Perry:** (UI) your waist. Okay. You have ID with you sir?

Doc. 63 Ex. 1A at 9:14–17.

On the whole, the enhanced audio submitted by the government does little to clarify what was said and does nothing to support SA Perry's testimony that Mr. Muse said "yeah" in response to his request for the pat-down search. While the word "OK" can be heard on the enhanced audio, it comes after a significant gap in time and cannot be clearly attributed to Mr. Muse, especially given the conflicting opinion of the government's first transcriptionist. The government's own expert also appears to reject its suggestion that Mr. Muse's response was inaudible because he spoke over SA Perry. Gov't Ex. 16 at 5. The Court accordingly finds no clear error in its factual findings on this point. *See Servants of Paraclete*, 204 F.3d at 1012.

The Court is also not persuaded by the government's argument that it misinterpreted the other evidence it relied upon in finding SA Perry not credible. First, while the Court acknowledges that Mr. Muse made several statements in his post-arrest interview that could be read as suggesting that he affirmatively consented to the search, the Court maintains that the discussion, when viewed in its entirety, is at least equally consistent with a finding that he never gave such consent. When SA Perry asserted, for example, that he asked Mr. Muse for permission, Mr. Muse responded "Oh, I, I (UI) said, 'I'm gonna pat you down.'" Doc. 63 Ex. 2A at 15:13–14. Perry then stated, "Remember, I asked you permission," to which Mr. Muse replied "Oh." *Id*. at 15:17–18. Mr.

10

Muse later explained that he "didn't really hear" Perry because he had headphones on and thought Perry said "well, I'm gonna pat you down now" rather than asking for his consent. *Id*. at 16:1–5.

While in its Reply the government states that Mr. Muse "effectively admitted or acknowledged" giving Perry his consent during this conversation, the Court does not agree. Doc. 80 at 3. As noted above, Mr. Muse made several attempts to explain to Perry that he didn't hear or understand the pat-down request. To the extent that Mr. Muse did not object to Perry's later assertion that he said "yeah" in response to the request, and that he was so nervous he "probably [didn't] remember" what was said, the Court is left with the unavoidable impression that Muse was simply acquiescing to Perry's repeated attempts to lead him into accepting a more favorable version of events. Doc. 63 Ex. 2A at 16:6–14.

Next, the Court readily acknowledges that SA Perry's difficulty remembering details about the other passengers he encountered on the bus is understandable given the amount of time that has passed since the arrest in this case and the number of passengers on buses and trains he interacts with. However, as the defense points out, Perry also could not recall at the evidentiary hearing certain facts about this encounter with Mr. Muse, such as whether he was wearing headphones and whether he was holding a phone. Doc. 78 at 3 n.1. SA Perry's inability to remember details about the day in question, while not surprising, goes to the weight the Court should place on his memory about what exactly Mr. Muse said, especially where Mr. Muse's purported response does not appear on any of the audio recordings presented by the government. The Court sees no error in its consideration of this issue.

Finally, the Court agrees with the defense that the government has failed to provide a satisfactory explanation for why SA Perry inaccurately described the search in his sworn complaint and why the Court should not rely on that troubling fact in weighing his credibility in this case.

The government's explanation that Perry was instructed to use vaguer language as a "precaution" aimed at the "laudable goal" of avoiding unnecessary embarrassment strains credulity. Doc. 74 at 13. Criminal cases often contain intimate details about the lives of all parties involved, and such evidence is presented in open court on a daily basis. The Court also cannot ignore the legal significance of the detail SA Perry was told to refer to differently. A search of someone's genitals implicates Fourth Amendment privacy concerns that a search of someone's "abdomen" does not. Last, the Court agrees with the defense that the fact that Perry was acting under the instruction of members of the United States Attorney's Office does not absolve him of responsibility for the misleading language he used or restore his credibility. Doc. 78 at 4. SA Perry is ultimately the person who conducted the search of Mr. Muse, and he is the person who swore to the truthfulness of his complaint in front of a United States Magistrate Judge. *See* Doc. 2 at 1.

## CONCLUSION

For the reasons stated above, the government has not established that the Court erred in finding that SA Perry's testimony that Mr. Muse said "yeah" in response to his request for a pat-down search was not credible. Doc. 71 at 15. After reviewing the record, listening to the enhanced audio recordings, reading the accompanying expert report, and considering the parties' arguments, the Court reaches the same conclusion today. The government's Motion for Reconsideration [Doc. 74] is accordingly **DENIED.**

Dated this 12th day of February, 2020.

                                                **MARTHA VÁZQUEZ**
                                                UNITED STATES DISTRICT JUDGE

Mallory M. Gagan
Assistant Federal Public Defender          Paul H. Spiers
*Attorney for Mr. Muse*                      *Assistant United States Attorney*